# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS

---

### BURLEY v. UNITED STATES et al.

(Circuit Court of Appeals, Ninth Circuit. July 5, 1910.)

#### No. 1,803.

1. EMINENT DOMAIN (§ 29*)—GOVERNMENT IRRIGATION PROJECT—STATUTES—CONSTRUCTION.

Irrigation Act June 17, 1902, c. 1093, § 1, 32 Stat. 388 (U. S. Comp. St. Supp. 1909, p. 596), provides for the formation of a reclamation fund with money received from the sale of public lands in certain states and territories. Section 3 authorizes the withdrawal from entry of lands required for irrigation works, and on the completion of surveys of such lands, etc., makes it the duty of the Secretary of the Interior to determine whether the project is practicable, and, if so, the public lands which they propose to irrigate shall only be subject to entry of specified tracts. Section 4 provides that, if there are necessary funds in the reclamation fund available for the purpose, the project shall be constructed on a contract with the Secretary, who shall give notice of the lands irrigable and of the charges to be made per acre on the entries to be made and on lands in private ownership which may be irrigated by the waters in the project. Section 5 declares that no right to the use of water for land of private ownership shall be sold exceeding 160 acres to any one landowner. *Held*, that the act contemplated the irrigation of private lands as lands belonging to the government, and that the fact that a scheme contemplated the irrigation of private as well as a large tract of government land did not render the project illegal, so as to prevent the condemnation of land necessary to carry it out.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 76; Dec. Dig. § 29.*]

2. EMINENT DOMAIN (§ 5*)—IRRIGATION—RIGHTS OF THE UNITED STATES.

The United States has constitutional authority to organize and maintain an irrigation project within a state where it owns arid lands, whereby it will associate with itself other owners of like lands for the purpose of reclaiming and improving them, and for that purpose may exercise the right of eminent domain against other landowners to obtain land necessary to carry the proposed project in effect.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 19–23; Dec. Dig. § 5.*

Nature and extent of power of United States to condemn property for public use, see note to Town of Nahant v. United States, 70 C. C. A. 653.]

In Error to the Circuit Court of the United States for the Central Division of the District of Idaho.

---

Condemnation proceedings by the United States of America and the County of Canyon, Idaho, against David E. Burley. From an order directing condemnation (172 Fed. 615), defendant brings error. Affirmed.

This action was brought in the Circuit Court of the United States for the District of Idaho, by authority of the Attorney General of the United States, on behalf of the United States, pursuant to an application made therefor by the Secretary of the Interior, proceeding under section 7 of the Act of June 17, 1902, c. 1093, § 7, 32 Stat. 388 (U. S. Comp. St. Supp. 1909, p. 600), entitled, "An act appropriating the receipts from the sale and disposal of public lands in certain states and territories to the construction of irrigation works for the reclamation of arid lands." The state of Idaho is one of the states made subject to the provisions of this act. Section 7 provides as follows: "That where in carrying out the provisions of this act it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney General of the United States upon every application to the Secretary of the Interior, under this act, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice."

It is alleged in the amended complaint that the Secretary of the Interior had caused to be surveyed and located a certain irrigation project in the state of Idaho, known as the "Payette-Boise Project," and had determined that the same was practicable, and had let the contracts for the construction thereof; that the said irrigation project included as a part thereof the construction of a reservoir in Canyon county, Idaho, commonly known and designated as the "Deer Flat Reservoir"; that the site of the reservoir included two certain described tracts of land in Canyon county, Idaho, containing in the aggregate 296 acres, the title to which stood in the name of the defendant Burley, who was capable of conveying title in fee to said premises free and clear of all incumbrances, except the interest therein of the county of Canyon, Idaho; that the county of Canyon claimed some interest, estate, or title in said premises; that the reservoir was at the time of the filing of the complaint in the actual course of construction, and when completed the water impounded by said reservoir would completely overflow the lands described in the complaint; that it had become necessary that the United States acquire title to the lands described in the complaint for use as a part of said reservoir site, and for such purpose the United States, acting through the Secretary of the Interior, had been and was desirous of purchasing and acquiring title in fee to said tract of land for that purpose; that the Secretary of the Interior was authorized by law to acquire said lands by condemnation, and in his opinion it was necessary and advantageous to the government that the said lands should be so acquired; that said irrigation project was being primarily constructed for the purpose of supplying water for irrigation to arid lands in Ada and Canyon counties, in the state of Idaho, which were public lands of the United States, and that more than 50,000 acres of the public lands of the United States would be supplied with water for irrigation and reclamation from the said project by means of said Deer Flat reservoir; that the land described, the title to which was in the defendant, and which was included in said reservoir site, was absolutely necessary for the use of the government in the construction of said reservoir; that the reasonable value of said land did not exceed $10 per acre, amounting to $2,960, and the United States offered to purchase said lands at said valuation; that a disagreement had occurred and then existed between the defendant and the United States concerning the purchase of said tracts of land by the United States, to wit, that the United States and defendant were unable to agree upon a price for the land which the United States considered to be reasonable; and that the defendant asked and demanded therefor a price which in the opinion of the United States was more than said land was worth. The United States prayed for judgment that it should be adjudged that the public use required the

condemnation of the land described, and that the United States should be entitled to take and hold title in fee to said land for the public use specified upon making compensation therefor, and that the court proceed to determine in the manner prescribed by law; compensation to be paid by the United States for the said property.

To this amended complaint the defendant interposed a demurrer on various grounds of uncertainty, among others, that it did not appear therefrom whether it was the purpose of the United States to devote said irrigation project wholly and entirely to the irrigation of lands owned or possessed by the United States, or whether its purpose was to devote said reservoir and project in part or otherwise to furnishing water for the purpose of irrigating lands in which the United States had no title or possession, but which were owned and possessed by other persons. The demurrer upon the ground mentioned was overruled, and thereupon the defendant answered, in which he admitted, among other things, the allegation in the amended complaint that a disagreement had occurred and then existed between the defendant and the United States concerning the purchase of said tracts of land by the United States; that is to say, the disagreement was as to the purchase price, but the defendant denied that he demanded or asked a price for said lands in excess of their worth. The defendant, further answering, and as a further defense to the cause of action, alleged that he was informed and believed, and therefore averred the fact to be, that it was the design, intention, and purpose of the United States to construct the irrigation project mentioned and described in said amended complaint for the purpose of supplying water to lands not owned or possessed by the United States, or in which the United States had any interest of any kind or character, but which were owned and possessed by, and in which private individuals alone were interested, and that the proceeding was instituted for the purpose of, and it was the design and intention of the United States, if successful therein, to devote said land of defendant to said purposes, in order to enable the United States to irrigate such lands, the title to which was reposed in private ownership, and to further the interests of the owners thereof, and to use and devote defendant's lands in aid of private enterprises in the improvement of lands not owned, possessed, or controlled in any wise by the United States, or in which it had any right, title, interest, or possession of any kind or character whatsoever, of a public or governmental nature.

Upon the issues thus presented the case was tried before the court and a jury upon a stipulation between the parties to the action that all issues, except that of the value of the land sought to be condemned, should be heard before the court without a jury, and that the question of the value of the land should be submitted to the jury. Thereupon a jury was impaneled, and, the court having announced its decision upon the issues submitted to it, the jury, under the instructions, returned a verdict for the amount agreed upon by counsel for the respective parties, to wit, the sum of $5,920. The findings of the court upon the issues submitted to it were as follows:

"(1) That this action is brought by the authority of the Attorney General of the United States, on behalf of the United States, pursuant to an application made therefor by the honorable Secretary of the Interior of the United States, proceeding under the provisions of an act of Congress entitled 'An act appropriating the receipts from the sale and disposal of public lands in certain states and territories for the construction of irrigation works for the reclamation of arid lands,' approved June 17, 1902. 32 Stat. 388.

"(2) That long prior to the commencement of this action the honorable Secretary of the Interior, proceeding under authority of said act, caused to be surveyed and located a certain irrigation project in the state of Idaho known as the 'Payette-Boise Project,' and determined that the same was practicable, and let contracts for the construction thereof; said project being situate in the counties of Ada and Canyon. That said project includes, as a part thereof, the construction of a reservoir in Canyon county, Idaho, commonly known and designated as the 'Deer Flat Reservoir,' the site of which is a natural basin comprising approximately 10,000 acres of land. That the land described in the amended complaint as belonging to the defendant, the title to which the plaintiff seeks by this action to acquire, is situate within

said basin, and will, if said basin is used as a reservoir site, be covered with water. That said reservoir was, at the time of the commencement of this action, in the actual course of construction. That both the lands embraced in said reservoir site and those in the vicinity thereof are arid in character, and cannot be profitably farmed without artificial irrigation. That of the lands embraced within the reservoir site the plaintiff owned only a small portion, but of the lands adjacent thereto and in the vicinity thereof, and susceptible of irrigation therefrom, the plaintiff was the owner of approximately 45,000 acres, and approximately the same amount of lands had passed to patent and were in private ownership. That at the time said project was surveyed and its feasibility considered all the natural flow of Boise river, the only available source of supply for the irrigation of said and other lands during a large portion of the irrigating season, had been appropriated, and was being diverted by private corporations for the irrigation of agricultural lands, and no considerable additional area could be irrigated, except by storing and conserving waters flowing in the river during the winter months, or during the high-water season. The project as finally decided upon by the honorable Secretary of the Interior contemplated the taking over of an existing canal, called the 'New York Canal,' which was to be improved, enlarged, and extended, and through which water was to be carried to said reservoir for the supply thereof during seasons of the year when there was an adequate supply of water in the river for such purpose, and for delivering water to parties who already had the right to receive water from said canal by reason of existing contracts, and also to furnish water for the irrigation of lands belonging to the plaintiff which were susceptible of irrigation from said canal, and for the irrigation of unreclaimed lands belonging to private individuals, but the entire project was for the irrigation and reclamation of arid lands. That after the government had made some investigation, but before said project was decided upon, property owners and citizens of said counties of Ada and Canyon entered upon a systematic agitation of the project, and certain individuals, acting upon behalf of the public, and complying with the laws of the state of Idaho relative to securing permits for the appropriation of water, secured permits for such appropriation from the Boise river, and assigned the same to the United States, and the owners of arid lands, for the irrigation of which there was no available water, proffered to the government their cooperation and assistance, agreeing that if the government would undertake the project, and thereby furnish water for the irrigation of their lands, they would bear their proportion of the expense thereof. That in consideration of the large tract of public land to be irrigated and reclaimed by means of said project, and such co-operation and assistance from private owners, the honorable Secretary of the Interior adopted said project and entered upon its construction. That in order to irrigate some of the public lands lying in the vicinity of said reservoir it is necessary to maintain the water in said reservoir at such a level as will cause the same to overflow the defendant's land. That at the time said project was being investigated the public lands lying in the vicinity of said reservoir site and susceptible to irrigation from said reservoir were withdrawn from entry under the public land laws, and since said withdrawal substantially all of said lands have been entered under and subject to the conditions of said reclamation act.

"(3) That the honorable Secretary of the Interior entered upon said project of the construction of said reservoir primarily for the purpose of irrigating public lands of the United States, and that the United States has a large and substantial interest in the successful execution of that project, in that thereby water will be rendered available for the irrigation of large tracts of its own lands, thus rendering them marketable; and that, for the purpose of carrying out said irrigation project, it is necessary that the plaintiff acquire the title to the defendant's lands, as the same are described in the amended complaint, in order that it may use them for a part of said reservoir site.

"(4) That the defendant, David E. Burley, is the sole owner of said lands, and the county of Canyon has no title thereto or interest therein.

"(5) That the plaintiff and the defendant, David E. Burley, were unable to agree upon the value of said lands, or the price to be paid therefor by the plaintiff.

"And as conclusions of law from the foregoing facts it is found that the plaintiff seeks to condemn said lands and to acquire title thereto for a lawful purpose, and that the honorable Secretary of the Interior, in entering upon said project, did not exceed the authority conferred upon him by the provisions of said act of June 17, 1902, and that said lands are necessary to such purpose, and that the plaintiff is entitled to expropriate them and acquire title thereto upon the payment to the defendant of a just compensation therefor, namely, the amount found by the jury."

The compensation agreed upon and found by the jury having been paid into court, the judgment and order of condemnation was made. The case comes here upon writ of error from the judgment.

John G. Willis, for plaintiff in error.

C. H. Lingenfelter, U. S. Atty., and B. E. Stoutemyer, for defendants in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The allegation of the amended complaint that a disagreement had occurred and existed between the defendant and the United States concerning the purchase price of the land sought to be condemned, in this, that the parties were unable to agree upon a price for said land, the admission of the answer that this allegation was true, except that the defendant denied that he demanded or asked a price for the land in excess of its worth, the stipulation of the parties at the trial that the question of value of the land should be submitted to a jury, and the fact that the amount for which the jury was asked to render a verdict was agreed upon by counsel for the respective parties and paid into court, have the appearance of stating a single original subject of controversy, and come very nearly rendering other questions in the case feigned issues. But this feature of the proceeding was evidently not so intended and will not be so considered. It will be treated, however, as showing conclusively that there is no claim on the part of the defendant that the United States is seeking to appropriate defendant's land without just and adequate compensation. A just and adequate compensation has been agreed upon and paid into court, and the defendant is not required to surrender his title or any rights that he may have therein without just and adequate compensation being first paid to him by the United States as provided by law.

It is contended by the defendant that the demurrer to the complaint should have been sustained because of the insufficiency of the complaint and uncertainty of the allegation as to the purpose of the United States in acquiring title to defendant's property; that is to say, it is uncertain, because it does not appear whether it was the purpose of the United States to devote the proposed irrigation project wholly and entirely to irrigation of lands owned or possessed by the United States, or whether it was proposed to devote said reservoir and project, in part or otherwise, to furnishing water for the purpose of irrigating lands in which the United States had no title, interest, or possession, but which were owned and possessed by other persons.

The specific objection to the complaint is that it is uncertain, because it alleges "that said irrigation project is being primarily constructed for the purpose of supplying water for irrigation," etc., and

that a statement as to secondary and other purposes is withheld, giving birth to a suspicion that the United States has a purpose which it does not disclose, lest such disclosure should work a failure of the proceeding. It appears from the opinion of the learned judge in the court below (United States v. Burley [C. C.] 172 Fed. 615, 618) that the original complaint was silent as to the ownership of the lands to be irrigated from the reservoir. A demurrer to the complaint was accordingly sustained by the court upon that ground, and, complying with the suggestion of the court, the attorney for the United States in the amended complaint alleged that the "project was being primarily constructed for the purpose of supplying water for irrigation to arid lands in Ada and Canyon counties in the state of Idaho, which are public lands of the United States." There was a demurrer to this amended complaint on the ground of uncertainty, and the objection renewed that the allegation as to the "primary" purpose of the United States in appropriating this land was not sufficient. The demurrer was overruled, and the allegation of the complaint denied in defendant's answer; and upon the issue thus joined evidence was taken, a finding made, and judgment of condemnation entered in favor of the United States.

We need not stop to discuss the various meanings of the word "primarily." It will be sufficient to assign to it a meaning having reference to the subject-matter and the surrounding circumstances. This rule of interpretation permits us to refer to the findings of fact in this case, based upon the evidence admitted in support of the allegation concerning the primary purpose of the irrigation project described in the complaint. It was there found that the entire project was for the irrigation and reclamation of arid lands. It contemplated the taking over of an existing canal, called the "New York Canal," which was to be improved, enlarged, and extended, and through which water was to be carried to a reservoir for the supply thereof during the seasons of the year when there was an adequate supply of water in the river for such purpose. The project so far appears to be entirely in accord with the act of June 17, 1902, which provides in section 1 that certain money received from the sale and disposal of public lands in certain states and territories including the state of Idaho shall be "reserved, set aside, and appropriated as a special fund in the treasury to be known as the 'reclamation fund,' to be used in the examination and survey for and the construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the said states and territories" named.

But the findings go further, and find that the project contemplated: (1) The delivery of water to parties who already had the right to receive water from said canal by reason of existing contracts. (2) To furnish water for the irrigation of lands belonging to the United States which were susceptible of irrigation from said canal. (3) For the irrigation of unreclaimed lands belonging to private individuals. It was found, further, that the project of the construction of said reservoir was entered upon "primarily" for the purpose of irrigating public lands of the United States, and that the United States had a large

and substantial interest in the successful execution of that project, in that thereby water would be rendered available for the irrigation of large tracts of its own land, thus rendering them marketable, and that for the purpose of carrying out said irrigation project it was necessary that the United States should acquire the title to the defendant's lands as the same were described in the amended complaint in order that it might use them for a part of said reservoir site.

We now have a clear understanding of the meaning of the word "primarily" as used in the complaint. It means that the entire project is for the irrigation and reclamation of arid lands, and that the dominating purpose of the United States is to store and supply water for the irrigation and reclamation of its own arid lands. But the use of the word "primarily" in describing the project and the dominating purpose concerning such lands admits the existence of a secondary or concomitant purpose to deliver water to parties who already had the right to receive water from the existing canal, and also to furnish water for the irrigation of unreclaimed arid lands belonging to private individuals. The defendant contends that the United States has no right to take his property for a purpose which includes such secondary or concomitant purpose, and because the complaint has been framed in view of this construction he contends that it is open to his demurrer for insufficiency and uncertainty.

In determining this question our first inquiry must be whether the irrigation of private lands of an arid character is authorized by the act of June 17, 1902. The title of the act is:

"An act appropriating the receipts from the sale and disposal of public lands in certain states and territories to the construction of irrigation works for the reclamation of arid lands."

In section 1 of that act there is a provision for the formation of a "reclamation fund" with the money received from the sale of public lands in certain states and territories. In section 3 the Secretary of the Interior is authorized to withdraw from public entry the lands required for irrigation works contemplated by the act, and also lands believed to be susceptible of irrigation from said works, and upon the completion of surveys of such lands, and of the necessary maps, plans, and estimates of cost, the Secretary of the Interior is required to determine whether or not the project is practicable and advisable, and, if found to be so, the public lands which it is proposed to irrigate by means of the contemplated works shall be subject to entry only under the homestead laws in tracts of not less than 40 nor more than 160 acres, and shall be subject to the limitations, charges, terms, and conditions in the act provided. In section 4 an irrigation project determined by the Secretary of the Interior to be practicable may be constructed by contract, providing there are the necessary funds in the "reclamation fund" available for that purpose. If there is, the Secretary of the Interior is then required to give notice of the lands irrigable under such project, and, among other things, the charges which shall be made per acre upon the entries made under the provisions of the act and "upon lands in private ownership which may be irrigated by the waters of the said irrigation project." In section 5 it is further

provided that "no right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner." The act clearly provides for the irrigation of private lands under the conditions therein specified where such lands are arid and within the limits of an irrigation project deemed by the Secretary of the Interior to be practicable and advisable. We are therefore of the opinion that the complaint is not open to the defendant's demurrer on the ground of insufficiency or uncertainty under the provisions of the act of Congress.

We come now to the consideration of the real question in this case, which is presented as a constitutional question and may be stated in the following terms: Can the United States, owning arid lands within a state, organize and maintain a scheme or project whereby it will associate with itself other owners of arid lands for the purpose of reclaiming and improving such lands, and in that behalf exercise the right of eminent domain against another landowner for the purpose of obtaining the title and possession of land absolutely necessary in carrying the proposed scheme or project into effect?

It is contended by the defendant that this cannot be done, and the case of Kansas v. Colorado, 206 U. S. 46, 91, 27 Sup. Ct. 655, 665, 51 L. Ed. 956, is cited as authority for such a limitation upon the power and authority of Congress. It is said that the court, referring to the statute under consideration, held in substance that article 4, § 3, of the Constitution of the United States, providing that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States," did not authorize Congress to provide an irrigation project to be carried out within a state for the reclamation of arid lands not the property of the United States. The controversy in that case was between the states of Kansas and Colorado concerning the diversion of the waters of the Arkansas river for the irrigation of lands in Colorado. It was alleged that such diversion damaged certain riparian proprietors in Kansas, through which state the river flows. The case was decided against the state of Kansas on the ground that the detriment to Kansas in the diminution of the flow of water by the diversion in Colorado, while substantial, was not so great as to make the appropriation of the water in Colorado an inequitable apportionment between the states. The United States intervened in the case for its interest, contending that the determination of the rights of the two states inter sese in regard to the flow of water in the Arkansas river was subordinate to the superior right on the part of the national government to control the whole system of reclamation of arid lands within the states. It was in answer to this contention that the court expressed the opinion, the substance of which has been stated. But the court said further concerning the national control of the arid regions:

"It does not follow that the national government is entirely powerless in respect to this matter. These arid lands are largely within the territories, and over them, by virtue of the second paragraph of section 3 of article 4 heretofore quoted, or by virtue of the power vested in the national government to acquire territory by treaties, Congress has full power of legislation, subject to no restrictions other than those expressly named in the Constitu-

tion, and therefore it may legislate in respect to all arid lands within their limits. As to those lands within the limits of the states, at least of the Western states, the national government is the most considerable owner, and has power to dispose of and make all needful rules and regulations respecting its property. We do not mean that its legislation can override state laws in respect to the general subject of reclamation. While arid lands are to be found mainly, if not only, in the Western and newer states, yet the powers of the national government within the limits of those states are the same, no greater and no less than those within the limits of the original thirteen, and it would be strange if, in the absence of a definite grant of power, the national government could enter the territory of the states along the Atlantic and legislate in respect to improving by irrigation or otherwise the lands within their borders. Nor do we understand that hitherto Congress has acted in disregard to this limitation."

That is to say, it would be strange if the national government could enter the territory of a state where there were no public lands of the United States requiring irrigation and no public lands through which water flows necessary for the irrigation of arid lands, and by legislation provide a system of irrigation for the private lands within the state and control its administration. It would indeed be a strange proceeding and obviously wholly outside of the authority of Congress. But in this case the United States is the owner of large tracts of land within the states named in the act of June 17, 1902. The public welfare requires that these lands, as well as those held in private ownership, should be reclaimed and made productive. To do this effectively and economically with the available water supply, large tracts must be brought into relation with a single system or project. These states having arid lands have accordingly acted upon the subject, and in the state of Idaho, where the land is located in this case, it has been provided in section 14 of article 1 of the Constitution that:

"The necessary use of lands for the construction of reservoirs, or storage basins, for the purposes of irrigation, or for the rights of way for the construction of canals, ditches, flumes or pipes to convey water to a place of use, for any useful, beneficial or necessary purpose or for drainage or for the drainage of mines, etc. * * * is hereby declared to be a public use, and subject to the regulation and control of the state. Private property may be taken for public use but not until a just compensation, to be ascertained in the manner prescribed by law, shall be paid therefor."

The act of June 17, 1902, not only recognizes the Constitution and laws of the state providing for the appropriation of its waters and the reclamation of its arid lands, but it requires that the Secretary of the Interior, in carrying out the provisions of the act, shall proceed in conformity with such laws. In what respect does such a proceeding contravene the Constitution of the United States? Has not the United States as a landowner the same rights within the state that any other landowner has? And when the land is of such a character that, to be useful, it must be irrigated and reclaimed in large tracts, may not the United States, co-operating with such other landowners, organize and establish an effective and economical system or project for such irrigation and reclamation? And, finally, if the necessary use of lands for such a purpose is made a public use by the state, is there any reason why the United States should not exercise its right of eminent domain to acquire title to lands absolutely necessary to such public use?

We can think of no constitutional objection to such a proceeding, when it is clearly established that with respect to surrounding circum- stances and conditions the use is a public use; and, while it has been held that the law of the state is not conclusive upon this subject, the Supreme Court of the United States in numerous cases has deter- mined that such a use as here described in the project under consider- ation is a public use.

In Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 161, 17 Sup. Ct. 56, 64 (41 L. Ed. 369), the Supreme Court had under consid- eration the validity of the law of the state of California providing for the organization and government of irrigation districts. It was con- tended that the proceedings under the act with respect to an assess- ment upon certain land within the district, if upheld as constitutional, would result in the taking of the property of one person or class of persons and giving it to another—"an act," it was said, "of pure spolia- tion." It had been held by the Supreme Court of the state of Califor- nia that the use of water for irrigation purposes under the provision of the state act was a public use, and a corporation organized by virtue of the act for the purpose of irrigation would be a municipal corpora- tion, and organized for the promotion of the prosperity and welfare of the people. The Supreme Court of the United States, reviewing the provisions of the act and the considerations for its enactment, said:

"Viewing the subject for ourselves and in the light of these considerations, we have very little difficulty in coming to the same conclusion reached by the courts of California. The use must be regarded as a public use, or else it would seem to follow that no general scheme of irrigation can be formed or carried into effect. In general, the water to be used must be carried for some distance and over or through private property, which cannot be taken in invitum if the use to which it is to be put be not public, and if there be no power to take property by condemnation it may be impossible to acquire it at all. The use for which private property is to be taken must be a public one, whether the taking be by the exercise of the right of eminent domain or by that of taxation. Cole v. La Grange, 113 U. S. 1 [5 Sup. Ct. 416, 28 L. Ed. 896]. A private company or corporation without the power to acquire the land in invitum would be of no real benefit, and at any rate the cost of the undertaking would be so greatly enhanced by the knowledge that the land must be acquired by purchase that it would be practically impossible to build the works or obtain the water. Individual enterprise would be equally in- effectual. No one owner would find it possible to construct and maintain wa- terworks and canals any better than private corporations or companies, and unless they had the power of eminent domain they could accomplish noth- ing. If that power could be conferred upon them, it could only be upon the ground that the property they took was to be taken for a public purpose. While the consideration that the work of irrigation must be abandoned if the use of the water may not be held to be or constitute a public use is not to be regarded as conclusive in favor of such use, yet that fact is in this case a most important consideration. Millions of acres of land otherwise cultivable must be left in their present arid and worthless condition, and an effectual obstacle will therefore remain in the way of the advance of a large portion of the state in material wealth and prosperity. To irrigate, and thus to bring into possible cultivation, these large masses of otherwise worthless lands, would seem to be a public purpose, and a matter of public interest, not confined to the landowners, or even to any one section of the state."

The conditions referred to in that case are almost identical with the conditions in the present case, and the opinion of the court is pecu- liarly applicable to the question under consideration.

In Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, the action was brought in the state court of Utah by an individual landowner as plaintiff to condemn a right of way to enable the plaintiff to enlarge a ditch belonging to the defendants for the conveying of water across the land of the defendants for the purpose of irrigating plaintiff's land. The trial court found the facts to be that plaintiff's land was arid land and would not produce without artificial irrigation, but that with artificial irrigation the same would produce abundantly of grain, vegetables, fruits, and hay; that the use of the surplus waters of a certain creek which it was proposed to convey to plaintiff's land by the enlarged ditch was a public use; and that the plaintiff was entitled to a decree condemning a right of way across defendants' land for the purpose of carrying such surplus waters to the plaintiff's land. The case was taken to the Supreme Court of the United States as involving a constitutional question in the taking of defendants' land for a private use. Upon the facts stated in the findings of the trial court and having reference to the conditions stated it was held that the proceedings did not in any way violate the Constitution of the United States.

In Strickley v. Highland Boy Mining Co., 200 U. S. 527, 26 Sup. Ct. 301, 50 L. Ed. 581, the action was also brought in a state court of Utah to condemn a right of way under a statute of the state for an aërial bucket line across defendant's placer mining claim. It was objected that the right of way was solely for private use, and that the taking of the land for that purpose was in violation of the Constitution of the United States. The statute was held to be constitutional, and the proceeding upheld by the Supreme Court of the state, and the decision affirmed by the Supreme Court of the United States.

In the case of Bacon v. Walker, 204 U. S. 311, 316, 27 Sup. Ct. 289, 290, 51 L. Ed. 499, it was said with respect to the last-named case that it "was the recognition of the power of the state to work out from the conditions existing in a mining region the largest welfare of the inhabitants." This is the theory upon which the laws relating to the irrigation and reclamation of arid lands is based, and justifies the laws of the states upon the subject and the co-operation of the United States under the act of June 17, 1902.

The objection that the United States has no constitutional authority to enter into such co-operation and engage in the business of organizing and maintaining irrigation and reclamation projects of the character provided by the act of June 17, 1902, is equally untenable. The act was held constitutional by this court in United States v. Hanson, 167 Fed. 881, 93 C. C. A. 371, and we can add but little to what was said in that case. But, considering the provisions of the act in view of the specific objections against its constitutionality in this case, we must say that our opinion is not shaken as to the correctness of that decision. The policy of reclaiming the arid region of the West for a beneficial use open to all the people of the United States is as much a national policy as the preservation of rivers and harbors for the benefit of navigation. President Roosevelt, in his message to Congress in 1901, in urging the legislation which resulted in the passage of the reclamation act, made use of language applicable here. He said:

"It is as right for the national government to make the streams and rivers of the arid region useful by engineering works for water storage as to make useful the rivers and harbors of the humid region by engineering works of another kind. The storing of the floods in reservoirs at the headwaters of our rivers is but an enlargement of our present policy of river control, under which levees are built on the lower reaches of the same streams."

Again he says in the same message:

"The reclamation and settlement of the arid lands will enrich every portion of our country, just as the settlement of the Ohio and Mississippi Valleys brought prosperity to the Atlantic states. The increased demand for manufactured articles will stimulate industrial production, while wider home markets and the trade of Asia will consume the larger food supplies and effectually prevent Western competition with Eastern agriculture. Indeed, the products of irrigation will be consumed chiefly in upbuilding local centers of mining and other industries, which would not otherwise come into existence at all. Our people as a whole will profit, for successful home making is but another name for the upbuilding of the nation."

That the United States may, where the circumstances and conditions require it, reserve the waters of a river flowing through its public lands for a particular, beneficial purpose, was held by this court in Winters v. United States, 143 Fed. 740, 74 C. C. A. 666, and 148 Fed. 684, 78 C. C. A. 546. This decision was affirmed by the Supreme Court of the United States in Winters v. United States, 207 U. S. 564, 577, 28 Sup. Ct. 207, 212, 52 L. Ed. 340, where the court said:

"The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be. United States v. Rio Grande Dam & Irrigation Co., 174 U. S. 690, 702 [19 Sup. Ct. 770, 43 L. Ed. 1136]; United States v. Winans, 198 U. S. 371 [25 Sup. Ct. 662, 49 L. Ed. 1089]."

To the same effect was the decision of this court in Conrad Inv. Co. v. United States, 161 Fed 829, 831, 88 C. C. A. 647.

The authority of the United States to reserve the waters of its streams in the arid region for a beneficial purpose has been recently extended to the settlement of a long-standing controversy between the United States and Mexico respecting the use of the waters of the Rio Grande. By the Act Feb. 25, 1905, c. 798 (33 Stat. 814), the provisions of the reclamation act of June 17, 1902, were extended to the portion of the state of Texas bordering upon the Rio Grande which could be irrigated from a dam constructed near Engle in the territory of New Mexico. This act was passed for the purpose of enabling the United States to carry into effect the terms of a proposed treaty or convention with Mexico, which was afterwards signed on May 21, 1906 (34 Stat. 2953). This treaty or convention provided that:

"After the completion of the proposed storage dam near Engle, New Mexico, and the distributing system auxiliary thereto, and as soon as water shall be available in said system for the purpose, the United States shall deliver to Mexico a total of 60,000 acre-feet of water annually, in the bed of the Rio Grande at the point where the head works of the Acequia Madre, known as the Old Mexican Canal, now exist above the city of Juarez, Mexico."

By the Act March 4, 1907, c. 2918 (34 Stat. 1357), an appropriation of $1,000,000 was made available as needed, and to be expended under the direction of the Secretary of the Interior, for the construction of the above-mentioned dam in connection with the irrigation project on

the Rio Grande. By the Act June 12, 1906, c. 3288, 34 Stat. 259 (U. S. Comp. St. Supp. 1909, p. 603), the provisions of the reclamation act were extended so as to include and apply to the state of Texas, where there never has been any public lands of the United States, but where such streams as the Pecos and the Rio Grande, rising in New Mexico, a territory of the United States, and flowing into Texas, have become important factors in the irrigation and reclamation of the arid lands of that state.

This legislation illustrates the scope of the reclamation act and its purpose in preserving the waters and reclaiming the arid lands of the Western states, where, as said in Kansas v. Colorado, supra:

"The national government is the most considerable owner, and has power to dispose of and make all needful rules and regulations respecting its property."

The judgment of the Circuit Court is affirmed.